Laura S. CHILDRESS, Appellee

v.

Philip J. BOGOSIAN, Appellant.

Laura S. Childress, Appellee

v.

Philip J. Bogosian, Appellant.

Superior Court of Pennsylvania.

Argued Oct. 20, 2010.
Filed Jan. 10, 2011.

Dolores M. Troiani, Devon, for appellant.

Sheryl R. Rentz, Ardmore, for appellee.

BEFORE: BENDER, FREEDBERG and COLVILLE *, JJ.

OPINION BY BENDER, J.:

Philip J. Bogosian (Husband) appeals from the final decree in divorce, entered November 20, 2009, relating to equitable distribution issues, in which the court granted in part and denied in part the exceptions filed by both Husband and Laura S. Childress (Wife) to the master's report and recommendation (E.D. Report). Husband also appeals from a domestic relations order entered on the same day, relating to alimony *pendente lite* (APL) issues, in which the court granted in part and denied in part Wife's exceptions to the master's report and recommendations (Support Report).[1] We affirm.

The parties were married on December 26, 1998, and separated on December 1, 2004. The parties had no children.[2] Wife

---

\* Retired Senior Judge Assigned to the Superior Court.

**1.** By order dated January 6, 2010, this Court consolidated Husband's appeals *sua sponte.*

**2.** The master's E.D. Report indicates that after separation Wife was living with her son,

initiated the divorce proceedings by filing a complaint on February 11, 2005, including counts for equitable distribution, alimony and attorney's fees and costs. A divorce master was appointed.

The trial court set forth the following procedural history in regard to the equitable distribution matter in an opinion that accompanied the final decree in divorce:

> The Master held a preliminary conference on June 18, 2007, a settlement conference on September 17, 2007[,] and a second settlement conference on January 4, 2008. At the second settlement conference, [Husband] appeared with new counsel. The parties failed to conclude an agreement and on January 22, 2008 the matter was certified for trial. Husband again retained new counsel and the parties appeared at a third settlement conference on October 29, 2008. Absent an agreement, the Master held the trial as scheduled on November 3, 5 and 6, 2008, with a fourth day of trial held on January 5, 2009. The Master kept the record open until January 21, 2009 for Wife to submit a final proposed Exhibit P–33 and for Husband to object to same by letter marked Exhibit–66. Both parties filed post-trial briefs on or about February 27, 2009.

Trial Court Opinion, 11/20/09, at 1.

The master's E.D. Report was filed on June 11, 2009. It provides that the marriage, the first for both parties, lasted just short of six years, and that Wife was considerably younger than Husband. The master further found that Wife had a bachelor's degree and a master's degree in music, and that she had certificates from the American Conservatory in Fountainebleau, France, while Husband had attended four semesters of college and studied piano with private teachers. With regard to employment, the master found Wife has been a self-employed piano teacher and runs a piano teaching business from which she receives commission from other piano teachers who work for her. Likewise, Husband has been a self-employed piano teacher. He also earns income as a piano technician, a piano tuner and a piano dealer.

The master also discussed a spousal support order that was entered on June 23, 2005, requiring Husband to pay to Wife the amount of $1,750 per month. Arrears were to be paid at equitable distribution. The master explained that when Husband filed a modification petition on November 15, 2006, the support issues were consolidated with the equitable distribution proceedings and were heard by the master in the scope of those proceedings. Specifically, with regard to income, the master found Wife's net income per month to be $2,976,[3] and Husband's net income per month to be $5,911.

The master next addressed the real property owned by Husband and Wife's entitlement to a portion of the marital appreciation. The Berwyn home, which became the marital residence when the parties married, had been owned by Husband's mother with whom he lived. Husband inherited the property in 2003, when his mother died. Both parties offered ap-

who was three years old at the time of the hearing, and that her boyfriend, Joe Kerr, lived with her four days per week.

**3.** The master noted that although Wife collected no commissions from her boyfriend, Joe Kerr, who also is a piano teacher, the record did not contain sufficient evidence to calculate the amount of income Wife forfeited for diverting some of her students to Mr. Kerr. Additionally, the master noted that Mr. Kerr does not contribute to the household bills, but does pay $200 per month toward day care.

praisal reports and testimony from which the master determined a value of the property for the date of acquisition, for the date of separation, and for a date close to the time of the hearing. Specifically, the Master found that the Berwyn home was valued at $511,000 at the time of acquisition and at $675,000 as of October 2008, near the time of the hearing. Therefore, the master concluded that the marital appreciation of the Berwyn home was $164,000.

Prior to the marriage, Husband had owned property in Maryland (Porfin Drive), which he sold during the marriage, using some of the proceeds to purchase another Maryland property (Bay Landing) again titled solely in Husband's name. Based upon a lack of evidence in the record, the master indicated that she could not find any marital appreciation in the Porfin Drive property. However, with regard to the Bay Landing property, evidence was submitted as to the purchase price, the source of funds to purchase the property and to make major improvements, and the value of the property near the date of the hearing by way of appraisal reports. Based upon this evidence, the master concluded that the marital appreciation of the Bay Landing property was $422,000.

The master's E.D. Report also included discussion about Husband's Vanguard accounts. The master found that "the marital component of Husband's retirement account[s was] $146,584 as of October 24, 2008, taking into consideration the effects of market depreciation on each portion of the retirement accounts." E.D. Report, at 12. An additional item of contention was a diamond ring, which the parties agreed was valued at $16,925. Husband claimed the ring was non-marital property that he loaned to Wife to wear on special occasions. Wife countered that Husband had given her the ring four months prior to their marriage as an engagement ring. Based upon the testimony, the master concluded that the ring was given to Wife prior to marriage and was, therefore, her separate property.

Next, after discussing all the relevant factors enumerated in 23 Pa.C.S. § 3502(a) and finding that the total marital estate equaled $951,046, the master set forth the following recommendation:

> All relevant factors, including the eleven (11) factors as enumerated in the Divorce Code, which bear on the issue of equitable distribution have now been reviewed. While Husband has a significant separate estate, this was a short term, six year marriage. Husband was 50 years old at the time of marriage and had amassed his assets from his lifetime of work. The marital estate is significant and exists by virtue of Husband's pre-marital efforts and savings. Husband also inherited a sizable estate after his mother died, just 1½ years before separation. Wife was only 25 year[s] old at marriage. She had an encumbered piano and student loan debt at the time of marriage. The marriage enabled her to build a retirement fund, her business and a Steinway "D" piano. The marital estate is primarily attributable to the market appreciation of Husband's non-marital assets. For these reasons, the master recommends that the marital assets, except for the appreciation in the Bay Landing Property, be divided to achieve a distribution of 45% ($238,070) to Wife and 55% ($290,975) to Husband.

Master's E.D. Report, at 27. The master also recommended that the appreciation value of the Bay Landing property be divided 40% ($168,800) to Wife and 60% ($253,200) to Husband, due mainly to Hus-

band's significant non-marital contribution. *Id.* at 28.

In regard to APL,[4] the master's Support Report reveals that Husband had a net monthly income of $6,022 and that Wife's net monthly income totaled $2,384 for 2006, $2,742 for 2007, and $2,976 for 2008. Citing Pa.R.C.P. 1920.16–5(c), the master determined that a 20% downward deviation from the guideline calculation was appropriate, because Wife forfeited commissions from her boyfriend, Joe Kerr, for student referrals and did not receive contributions from Mr. Kerr for living expenses. Additionally, the master determined that although the parties were together for six years, at the time of the hearing they had been separated for more than four years. Specifically, the master reasoned that

> [Wife] had moved forward with her life in that she has had a child with another man, Mr. Kerr. [Wife] lives with Mr. Kerr at least 4 days each week and chooses not to receive financial assistance from him. Rather she seeks financial assistance from [Husband]. [Husband's] obligation to pay APL should terminate on April 25, 2007, providing her with two years of financial assistance.

Master's Support Report, at 9–10. After applying the 20% downward deviation, the master modified the June 2005 order to $1,164 for the period from November 15, 2006 to December 31, 2006, and for the period between January 1, 2007 and April 25, 2007, the master modified the payment to $1,050.

Both parties filed numerous exceptions with supporting briefs to the Master's E.D. Report and the court held oral argument. Thereafter, the court issued its final decree, granting the divorce. In the decree, the court listed the items contained in the marital estate, concluding that it totaled $806,022. The court accepted the master's recommendation as to a 45/55 division of the marital property and the 40/60 split of the Bay Landing property with Husband receiving the larger percentages. Specifically, Wife was entitled to assets or funds totaling $346,360 and Husband was entitled to assets or funds totaling $459,662.

With regard to the Master's Support Report, the court granted Wife's exception to the Master's recommendation that APL payments end in April 2007. Rather than terminate the APL in April of 2007, the court ordered the following monthly payments of APL from Husband to Wife: November 15, 2006 to December 31, 2006— $1,278; for the year 2007—$1,164; for the year 2008—$1,090; and for the year 2009—$974. The court then ordered APL payments to terminate on November 20, 2009, concurrently with the date that the final decree in divorce was issued. Husband was also ordered to pay to Wife $30,104 in arrears by January 31, 2010. Additionally, having granted Wife's petition for civil contempt, the court ordered Husband to pay a $1,000 fine to Wife due to Husband's contemptuous behavior.

Husband now appeals from the trial court's divorce decree and from its order related to APL, raising the following issues for our review:

1. Did the Honorable Trial Court err in determining the appreciation in value of Husband's property located in Berwyn which he inherited twenty (20) months before Wife left the marriage [?]

2. Did the Honorable Trial Court err in determining the appreciation in value of the Bay Landing property?

---

4. The initial entry of an APL order was June 23, 2005.

3. Did the Honorable Trial Court err in determining the value of Husband's Vanguard retirement account in that it failed to follow the formula set forth in 23 Pa.C.S. § 3501(a)(1) and failed to credit Husband with a post-separation contribution [?]

4. Did the Honorable Trial Court err in determining that Husband possessed donative intent when he permitted Wife to occasionally wear a ring which had been in his family for forty (40) years [?]

5. Did the Honorable Trial Court abuse it's [sic] discretion in applying the factors when formulating and determining the equitable distribution scheme and by basing its decision on factual and legal errors resulting in an inequitable and unjust award?

6. Did the Honorable Trial Court err in granting [Wife's] exception to the Master's report which reinstated Alimony Pendente Lite, which the Master had recommended be terminated [?]

7. Did the Honorable Trial Court err in determining that [Wife] had proven a need for Alimony Pendente Lite and in so doing, disregarded evidence of [Wife's] extravagant lifestyle and further erred in determining that Husband's income and financial resources are superior to [Wife's] [?]

8. Did the Honorable Trial Court err in finding [Husband] in contempt in that [Wife] failed to meet her burden of proof and no evidence was presented which would indicate that [Husband's] behavior was wilful [sic] or that he possessed the requisite wrongful intent [?]

Husband's brief at 11–12.

 Generally, in addressing the types of issues raised in the first five questions of this appeal, we are guided by the following:

A trial court has broad discretion when fashioning an award of equitable distribution. *Dalrymple v. Kilishek*, 920 A.2d 1275, 1280 (Pa.Super.2007). Our standard of review when assessing the propriety of an order effectuating the equitable distribution of marital property is "whether the trial court abused its discretion by a misapplication of the law or failure to follow proper legal procedure." *Smith v. Smith*, 904 A.2d 15, 19 (Pa.Super.2006) (citation omitted). We do not lightly find an abuse of discretion, which requires a showing of clear and convincing evidence. *Id.* This Court will not find an "abuse of discretion" unless the law has been "overridden or misapplied or the judgment exercised" was "manifestly unreasonable, or the result of partiality, prejudice, bias, or ill will, as shown by the evidence in the certified record." *Wang v. Feng*, 888 A.2d 882, 887 (Pa.Super.2005). In determining the propriety of an equitable distribution award, courts must consider the distribution scheme as a whole. *Id.* "[W]e measure the circumstances of the case against the objective of effectuating economic justice between the parties and achieving a just determination of their property rights." *Schenk v. Schenk*, 880 A.2d 633, 639 (Pa.Super.2005) (citation omitted).

*Biese v. Biese*, 979 A.2d 892, 895 (Pa.Super.2009). Moreover, it is within the province of the trial court to weigh the evidence and decide credibility and this Court will not reverse those determinations so long as they are supported by the evidence. *Sternlicht v. Sternlicht*, 822 A.2d 732, 742 (Pa.Super.2003), *aff'd*, 583 Pa. 149, 876 A.2d 904 (2005). We are also aware that "a master's report and recommenda-

**456**

tion, although only advisory, is to be given the fullest consideration, particularly on the question of credibility of witnesses, because the master has the opportunity to observe and assess the behavior and demeanor of the parties." *Moran v. Moran,* 839 A.2d 1091, 1095 (Pa.Super.2003) (citing *Simeone v. Simeone,* 380 Pa.Super. 37, 551 A.2d 219, 225 (1988), *aff'd,* 525 Pa. 392, 581 A.2d 162 (1990)).

Husband's first issue centers on the appreciation in value of the Berwyn property. In assigning a value of $511,000 for the date Husband acquired the property as an inheritance from his mother, the Master relied on the appraisal value suggested by Husband's appraiser, noting that Wife had not submitted an acquisition value "other than the fictitious number Husband claimed on the Inheritance Tax return." Trial Court Opinion, 11/20/09, at 14. The Master then assigned Wife's appraiser's value of $675,000 as of October 2008, concluding that the marital appreciation was $164,000. As noted by Wife in her brief, Husband's entire argument appears to simply take issue with Wife's appraiser's credentials and methodology, while touting his own appraiser's credentials and methodology. Essentially, Husband asserts that the comparison properties used by Wife's appraiser did not "meet the appropriate search criteria," Husband's brief at 24, and that the court's finding of the value at acquisition is inconsistent with the increase in value when both experts discussed a downturn in values since 2004.

 In conjunction with this argument, we recognize that:

"The Divorce Code does not specify a particular method of valuing assets." *Smith,* 904 A.2d at 21. Thus, "[t]he trial court must exercise discretion and rely on the estimates, inventories, records of purchase prices, and appraisals submitted by both parties." *Id.* at 21–22.

When "determining the value of marital property, the court is free to accept all, part or none of the evidence as to the true and correct value of the property." *Schenk,* 880 A.2d at 642 (citation omitted). "Where the evidence offered by one party is uncontradicted, the court may adopt this value even [though] the resulting valuation would have been different if more accurate and complete evidence had been presented." *Id.* "A trial court does not abuse its discretion in adopting the only valuation submitted by the parties." *Id.*

*Biese,* 979 A.2d at 897.

Here, the trial court accepted Husband's date of acquisition value ($511,000), a value advocated by Husband, but then accepted Wife's appraisal values at date of separation and date of hearing, deeming those values more credible (value at date of separation—$695,000 and value at date of hearing—$675,000). The court explained that the master had accepted as credible Wife's appraiser's valuation for the later dates, because in part "Husband's expert artificially limited her search for comparables to those valued at less than $600,000." Trial Court Opinion, 11/20/09, at 14. *Id.* The trial court found these facts supported by the record and the master's reasoning persuasive, thus, it adopted the master's decision with regard to the Berwyn property.

 Husband has not convinced us otherwise. Both a master and a trial court have discretion to accept or reject an expert's testimony. *See Vargo v. Schwartz,* 940 A.2d 459, 467 (Pa.Super.2007) (stating that "[t]he finder of fact is entitled to weigh the evidence presented and assess its credibility" and "[i]n so doing, the finder of fact 'is free to believe all, part, or none of the evidence and [we as an appellate court] will not disturb the credibility

determinations of the court below.' ").
The trial court also noted that:

> Husband, by highlighting that he inherited the Berwyn Property fewer than twenty months before Wife left the marriage to live with the father of her child, appears to invoke "marital misconduct" as an element that the master should have considered. This suggestion plainly violates the statutory directive that the court shall equitably divide marital property "without regard to marital misconduct." 23 Pa.C.S. § 3502(a).

Trial Court Opinion, 11/20/09, at 15. Essentially, the focus of Husband's entire argument appears to be an attack on the credibility determinations made by both the master and the trial court. This Court cannot overturn the findings made below on such a basis, most importantly, because they are supported by record evidence. Accordingly, we conclude that Husband's first issue is without merit.

Husband next argues that the trial court erred in determining the appreciation of the Bay Landing property. Specifically, Husband begins his argument by stating that the trial court "failed to credit Husband with any of his post-separation expenditures; failed to credit Husband with the costs of renovations to the home made with his separate funds and placed an unattainable burden of proof upon Husband to demonstrate that the renovations were made with separate funds and/or were in fact made." Husband's brief at 25.

In the trial court's opinion issued at the time the divorce decree was entered, the court discussed various credits awarded Husband by the master in regard to the Bay Landing property, and then found "that Husband [was] entitled to a further increase of his non-marital interest in Bay Landing by the amount of $92,759, the balance of Husband's proceeds from the sale of the Porfin Property." Trial Court Opinion, 11/20/09, at 17. The court further explained:

> Husband argues for additional credits towards the non-marital value of Bay Landing, claiming that as much as approximately $140,000 of additional non-marital funds were used to pay for substantial additional repairs and renovations. The Master found, and the court concurs, that while marital and non-marital funds may have been used for further work at the Bay Landing Property, Husband wholly failed to produce persuasive and credible evidence of what portion of these expenditures trace back to non-marital origins. (E.D. Report, p. 8.) No documents or physical evidence corroborated Husband's conclusory testimony. In the end, husband failed to overcome the presumption that these funds, expended during the marriage, constituted marital funds.

*Id.* at 17–18 (citations omitted). Then, in response to Husband's statement of errors complained of on appeal, submitted pursuant to Pa.R.A.P. 1925(b),[5] the trial court explained:

> In error no. 2, Husband complains that the court failed to find that the monies Husband expended on improvements to the Bay Landing Property were non-marital funds. Husband further complains that the court held Husband to an "unattainable burden of proof." The court did decline to find that Husband used non-marital funds for some significant improvement expenditures. The court also found Husband failed to prove that a significant portion of the expenditures actually were made on the vacation house improvements.

---

**5.** Husband's second claim of error in his Rule 1925(b) statement, which concerns the Bay Landing property, mirrors the second issue raised in this appeal.

(Opinion, [11/20/09,] p. 18, fn 8.) However, these determinations in no way invoked or relied upon a novel or "unattainable" burden of proof. As explained at pages 17–18 of the Opinion, Husband's burden required him to overcome a legal presumption that the subject monies comprised marital funds, as provided in 23 Pa.C.S. § 3501(b). The court properly applied this presumption, held Husband to his burden and employed a preponderance of evidence standard. *Sutliff v. Sutliff,* 518 Pa. 378, 385–7, 543 A.2d 534, 538 (1988); *Mackalica v. Mackalica,* 716 A.2d 653, 655–6 (Pa.Super.1998).

After applying the correct burden of proof, the court did not abuse its discretion when it found Husband's evidence was inadequate and unpersuasive. His proofs contained only his uncorroborated testimony plus a collection of miscellaneous receipts (*see,* exhibit D–27) (some of which were undated) and canceled checks (*see,* exhibits 30–31), a substantial portion of which contained no reference to the vacation home or, in many cases, even to the parties. *Cf., Mackalica v. Mackalica,* 716 A.2d 653, 656 (Pa.Super.1998) (Non-specific testimony that funds expended were premarital insufficient without corroborating evidence.) Additionally, assuming *arguendo* that all of the subject monies were spent on vacation home renovations, the record contains no reliable evidence which establishes a non-marital source for the monies or, that non-marital monies obviously commingled with marital monies could accurately be segregated. *Busse v. Busse,* 921 A.2d 1248, 1257 (Pa.Super.2007) ("Where pre-marital funds cannot be traced due to the commingling with marital funds, a court does not abuse its discretion in upholding a master's finding that the commingled funds are a marital asset.") After careful review, both the Master and the court determined that this loose compilation of evidence, together with Husband's inconsistent credibility, did not persuasively overcome the marital property presumption. Thus, Husband's alleged error no. 2, asserting that this court applied a novel or unattainable burden of proof is without a basis in fact or law.

Trial Court Rule 1925(a) Opinion, 2/5/10, at 4–5.

 Aside from stating what Husband deems to be the facts that the trial court should have accepted as true, Husband's entire argument here centers on the court's refusal to take judicial notice of an amortization table that he attached to the brief submitted to the master and to the one submitted to the trial court. Husband claims that the table would have indicated the amount of his mortgage balance at the date of separation and would have allowed the court to give him credit for the amount he paid post-separation. To support this claim, Husband relies on Pa.R.E. 201 ("Judicial notice of adjudicative facts"), which he asserts under the circumstances here is mandatory.

Initially, we note that the trial court does not mention the amortization table in either of its two extensive opinions, which in turn impedes this Court's ability to address the argument now raised on appeal. *See Estate of Daubert,* 757 A.2d 962, 963 (Pa.Super.2000) (stating that "[t]he facilitation of appellate review requires that the trial court be afforded the opportunity to address the issues raised on appeal.") In fact, we conclude that Husband has waived this particular argument in light of *Daubert* and the directive provided in Pa. R.A.P. 2116, which provides that "No question will be considered unless it is stated in the statement of questions involved or **is fairly suggested thereby.**" (Emphasis

added). Husband's second issue, as asserted by him in his Rule 1925(b) statement, did not in any conceivable way suggest that he claimed any error by the trial court in regard to its failure to take judicial notice of the amortization table. Therefore, we conclude that the trial court did not abuse its discretion in determining Husband's non-marital contributions and the distribution of the Bay Landing property on a 60/40 basis in Husband's favor without reliance on the amortization table. Indeed, we are puzzled by Husband's failure to request documentation from his lender as to the balance of the mortgage on the date of separation and for any post-separation payments he made, information to which he was certainly entitled as the borrower. Having concluded that Husband's specific argument regarding judicial notice is waived, we also conclude that his claim with regard to this issue is without merit.

In his third issue, Husband claims that the trial court failed to follow the formula set forth in 23 Pa.C.S. § 3501(a)(1) and failed to give Husband credit for a post-separation contribution with regard to his Vanguard retirement accounts. It is apparent when reviewing this argument, Husband intended to reference section 3501(a.1), which provides:

> **(a.1) Measuring and determining the increase in value of nonmarital property.**—The increase in value of any nonmarital property acquired pursuant to subsection (a)(1) and (3) shall be measured from the date of marriage or later acquisition date to either the date of final separation or the date as close to the hearing on equitable distribution as possible, whichever date results in a lesser increase. Any decrease in value of the nonmarital property of a party shall be offset against any increase in value of the nonmarital property of the party. However, a decrease in value of the nonmarital property of a party shall not be offset against any increase in value of the nonmarital property of the other party or against any other marital property subject to equitable division.

23 Pa.C.S. § 3501(a.1). Moreover, section 3501(a)(1) provides:

> "marital property" means all property acquired by either party during the marriage and the increase in value of any nonmarital property acquired pursuant to paragraphs (1) and (3) as measured and determined under subsection (a.1). However, marital property does not include:
>
> (1) Property acquired prior to marriage or property acquired in exchange for property acquired prior to the marriage.

23 Pa.C.S. § 3501(a)(1).

We recognize that the trial court found merit in Husband's argument "that the Master inaccurately calculated the value of the marital portion of Husband's Vanguard retirement funds resulting in amounts and distribution which violate 23 Pa.C.S. § 3501(a.1)." Trial Court Opinion, 11/20/09, at 7. Therefore, the court adjusted the master's calculation, but not in the manner that Husband proposed. After indicating that the master arrived at a martial value for Husband's Vanguard accounts of $146,584, the trial court explained the method it employed as follows:

> In this case, the court finds the [marital] amount to be $125,685 [5] less the appropriate amount of Husband's post-separation contribution. Husband contributed $22,372 in non-marital funds to the Vanguard Accounts post-separation. Because the market value of the Vanguard Accounts declined between the date of separation and the date of hearing, a portion of Husband's post-separation contributions likewise was reduced

through market decline and cannot be credited to Husband. The court calculates that an average of fourteen and one-half percent (14.5%) of Husband's post-separation contributions dissipated due to market decline.[6] The amount of the deduction representing Husband's post-separation contributions is therefore $19,128 ($22,372 × .855). Subtracting this number from the initial $125,685 results in a marital portion value of $106,556.[7] The court will use this figure in its Final Decree and grant Husband's exceptions 3.a and b.

---

5. The court arrives at this number by subtracting the value of the accounts as of the date of marriage ($243,253) from the value of the accounts as of the date of the equitable distribution hearings ($368,938). The court used the date of hearing value because it represented a lesser increase in the value of the accounts than did the value of the increase at the date of separation which had been $418,362. 23 Pa.C.S. § 3501(a.1).

6. This percentage was determined as follows: the overall decline of the Vanguard Accounts from the date of separation value ($418,362) to the date of hearing value ($368,938) represents a 12% drop. If it were assumed that all of Husband's post-separation contributions occurred on the first day of separation, a 12% rate of dissipation would be used. This assumption however cannot be made since Husband's contributions were made throughout the relevant time period. In a second calculation to determine the outer limit of depreciation, the court subtracted the full amount of Husband's post separation contributions from the date of hearing value, which then equals $346,566. The decline from the date of separation value to this latter number is a 17% drop. This calculation assumes that all of Husband's post-separation contributions occurred on the day before the date of hearing value. The average of the 12% decline and the 17% decline equals 14.5%. This methodology produces a reasonably accurate estimation of the amount of reduction in value of Husband's post-separation contributions due to market forces. The fact that Husband spread the post-separation contributions across three separate deposits, one each for 2005, 2006 and 2007 (Exhibits D–15, 19, 22 and 23), further supports the use of this averaging-method.

7. The Master's calculation of the value of the increase in the Vanguard Accounts resulted in a number which exceeded the difference between the date of marriage value and the date of hearing value. Because the value of the increase could not statutorily exceed that difference (since the date of marriage value was 100% non-marital), the Master's calculation appears incorrect as a matter of law. Although the court has no doubt that the Master's calculation method was utilized to achieve economic justice, this court cannot ignore the plain statutory directive of 23 Pa. C.S. § 3501(a)(1). *Empire Sanitary Landfill, Inc. v. Comm. Dept. of Environmental Resources*, 546 Pa. 315, 331 fn. 9, 684 A.2d 1047, 1054 fn. 9 (1996) *citing, Comm. Dept. of Public Welfare v. Eisenberg*, 499 Pa. 530, 534, 454 A.2d 513, 515–6 (1983) (equity will not intervene where there is available an adequate statutorily prescribed remedy at law); *see, also, Arsenal Coal Co. v. Comm. Dept. of Environmental Resources*, 505 Pa. 198, 208, 477 A.2d 1333, 1338 (1984).

Trial Court Opinion, 11/20/09, at 8–9.

█ Although the parties agree that Husband's Vanguard accounts are nonmarital property, Husband claims that the trial court treated these accounts differently than his other nonmarital assets, in particular, asserting that the assumptions made by the court were not supported by evidence of record and that the valuation formula it employed had no precedent, *i.e.*, did not follow the formula set forth in section 3501(a.1). To support his argument, Husband relies on *Ney v. Ney*, 917 A.2d 863 (Pa.Super.2007), contending that the trial court considered evidence outside the record when it concluded that Husband's post separation contributions had suffered a 14.5% decline in value. In *Ney*, the court used internet searches to aid in the determination of the father's income for support purposes. That type of action was not taken by the court here. Rather, the court relied on the evidence presented. Additionally, we again point out that Husband could have produced precise records showing the exact amount of losses and/or

gains predicated upon the post-separation contributions he made to the Vanguard accounts. Having failed to do so, Husband cannot complain that the court abused its discretion in applying a method that would produce an equitable resolution. *See Busse v. Busse,* 921 A.2d 1248, 1260 (Pa.Super.2007) (stating that "the trial court has the authority to divide the award as the equities present in the particular case may require.").[6] Having reviewed the record in regard to this claim, we conclude the trial court did not err in the manner it calculated the equitable distribution of the Vanguard accounts, thus, Husband's claim fails.

 Husband next raises an issue concerning the court's determination that he had given the "family" ring to Wife prior to marriage as an engagement ring thus making it her separate property. He claims that Wife only wore the ring when he allowed her to wear it. However, Husband acknowledges that the parties agreed to the value of the ring and that if it was found to belong to Wife, "it should be awarded to Husband because Wife does not want it, but instead wants its cash value." Husband's brief at 33.

Citing *Wagner v. Wagner,* 466 Pa. 532, 353 A.2d 819, 821 (1976), Husband recognizes that it is essential to show donative intent and delivery to prove that an item is in fact a gift. However, he claims that neither was proven and that Wife's and his testimony support his claim. Again, the essence of Husband's claim is an attack upon the credibility determinations arrived at by the master and the court. The master discussed both parties' testimony concluding that Wife's statements were more credible, and upon review, the trial court agreed. We "will not disturb the credibility determinations of the court below." *Anzalone v. Anzalone,* 835 A.2d 773, 780 (Pa.Super.2003). Husband's argument with regard to the ring is without merit. Based upon credibility determinations, the court did not abuse its discretion in concluding that the ring was Wife's separate property.

In his fifth issue, Husband argues that the trial court did not properly apply the factors that he claims weigh in his favor and would justify his being awarded a much greater portion of the marital estate. *See* 23 Pa.C.S. § 3502(a)(1)-(11). Without citation to the statutory provision setting out the eleven factors to be considered relevant to the equitable division of the marital property, Husband simply lists the various factors, discusses testimony, and indicates that most of the factors weigh in his favor, although he does acknowledge that a few of the factors are neutral. Husband then cites *Lee v. Lee,* 978 A.2d 380 (Pa.Super.2009), which he indicates stands for the proposition that "it is inequitable to

---

6. Specifically, as for Husband's claim regarding his 2004 contribution to his Vanguard account, which was made in 2005, the trial court explained:

> Husband also objects that the Master failed properly to credit Husband by subtracting a post-separation contribution to a Vanguard account which was made in 2005 as a part of Husband's 2004 tax return and tax planning. The Master correctly identified that even though Husband deposited funds in 2005, these funds were specifically identified with and credited against Husband's 2004 income and taxes due. (E.D. Report,

> p. 12 fn.3). This contribution is assessable as part of Husband's income and/or asset calculations for 2004, and not for 2005 (for either support or equitable distribution purposes). Husband directs the court to no authority which requires a contrary result. Also, Husband himself identifies his payment as a 2004 contribution (Exhibit D–25, p. 1). As a result, the Master properly found the contribution made in 2005 does apply to 2004 (pre-separation) and is therefore marital property.

Trial Court Opinion, 11/20/09, at 7 n. 4.

permit the non-contributing spouse to receive a disproportionate share of the other spouse's lifelong savings, even if those assets are gifted to the marriage." Husband's brief at 38–39. Husband also asserts that it would be "far more equitable that he receive 82% of the marital estate since he brought at least that much to the marriage." *Id.* at 39.

■ Husband's reliance on *Lee* is misplaced in that it does not stand for the proposition stated by Husband. Rather, the *Lee* court remanded the case, directing the trial court to "determine the percentage of the value of the marital home attributable to [the wife's] premarital interest, funds from the sale of [her] other premarital assets so used, and to joint marital assets, and to distribute the value of the home accordingly." *Id.* at 385. The remand order in *Lee* rested on the fact that the marital home was paid for by the wife to a great extent from her premarital funds but became marital property during refinancing when the husband's name was added to the deed. Thus, the situation in *Lee* is different than the one presently before this Court. Here, the Berwyn residence as well as other property at issue, including Husband's Vanguard accounts, all remain Husband's separate property with Wife only entitled to a portion of the appreciation. In addition,

> We do not evaluate the propriety of the distribution order upon our agreement with the court['s] actions nor do we find a basis for reversal in the court's application of a single factor. Rather, we look at the distribution as a whole, in light of the court's overall application of the [23 Pa.C.S.A. § 3502(a) ] factors [for consideration in awarding equitable distribution]. If we fail to find an abuse of discretion, the [o]rder must stand."

*Lee*, 978 A.2d at 383 (quoting *Trembach v. Trembach*, 419 Pa.Super. 80, 615 A.2d 33, 36 (1992)). "The trial court has the authority to divide the award as the equities presented in the particular case may require." *Id.* (quoting *Anzalone*, 835 A.2d at 785).

■ The trial court explained the basis for its agreement with the master's E.D. Report as to the section 3502 factors and the division of the marital estate, as follows:

> The Master addressed all of the § 3502 factors and thoroughly analyzed them. (E.D. Report, pp. 23–28.) In particular, the Master emphasized that this was a relatively short six-year marriage and that the marital estate is significant but exists primarily because of Husband's premarital efforts and savings. At 45% (and 40% of the Bay Landing Property), Wife shall receive marital property valued at nearly $350,000. At 55% (and 60% of Bay Landing), Husband shall receive marital assets in excess of $450,000, and shall retain a premarital estate valued in excess of at least $1.2 million dollars. The Master's overall distribution scheme is not inequitable to Wife when she gains such significant resources during this six-year marriage. Likewise, it is not inequitable for Husband to sacrifice this amount of increased value when he will remain far more financially secure than Wife. For these reasons, and those articulated by the Master, the Master did not abuse her discretion in apportioning the marital estate.

Trial Court Opinion, 11/20/09, at 6. We have reviewed the record and conclude that it supports the court's adoption of the master's findings with respect to the section 3502(a) factors. We also conclude that the court did not abuse its discretion by adopting the master's distribution scheme. Consequently, Husband's fifth issue is without merit.

Husband's sixth and seventh arguments relate to the November 20, 2009 support order that requires him to pay APL to Wife, and we address them together. Husband contends that the court abused its discretion by reinstating APL, which the master had terminated after a two-year period. Specifically, Husband claims that Wife did not show need in that she failed to provide sufficient documentation of her income, that she reduced her income by traveling to France and Texas for four to eight weeks each year, paying for her child's and boyfriend's tickets, and that she delayed APL proceedings because it was in her best interest to do so.

> We review APL awards under an abuse of discretion standard. *Haentjens v. Haentjens,* 860 A.2d 1056, 1062 (Pa.Super.2004). APL is "an order for temporary support granted to a spouse during the pendency of a divorce or annulment proceeding." 23 Pa.C.S.A. § 3103. APL "is designed to help the dependent spouse maintain the standard of living enjoyed while living with the independent spouse." *Litmans v. Litmans,* 449 Pa.Super. 209, 673 A.2d 382, 389 (1996). Also, and perhaps more importantly, "APL is based on the need of one party to have equal financial resources to pursue a divorce proceeding when, in theory, the other party· has major assets which are the financial sinews of domestic warfare." *Id.* at 388. APL is thus not dependent on the status of the party as being a spouse or being remarried but is based, rather, on the state of the litigation. *DeMasi v. DeMasi,* 408 Pa.Super. 414, 597 A.2d 101, 104–105 (1991). Alimony, in contrast, is termi-

nated upon remarriage or cohabitation. *Id.* at 104–105; *see also* 23 Pa.C.S.A. § 3706. Since, however, the purpose of APL is to provide the dependent spouse equal standing during the course of the divorce proceeding, it does not come with the "sanction" of Section 3706. *DeMasi,* at 104–105. "APL focuses on the ability of the individual who receives the APL during the course of the litigation to defend her/himself, and the only issue is whether the amount is reasonable for the purpose, which turns on the economic resources available to the spouse." *Haentjens,* at 1062; *see also DeMasi,* at 105.

*Schenk v. Schenk,* 880 A.2d 633, 644–45 (Pa.Super.2005). Additionally,

> "In ruling on a claim for alimony pendente lite, the court should consider the following factors: the ability of the other party to pay; the separate estate and income of the petitioning party; and the character, situation, and surroundings of the parties." *Litmans v. Litmans,* 449 Pa.Super. 209, 673 A.2d 382, 389 (1996). "An award of alimony pendente lite may be modified or vacated by a change in circumstances.... It is the burden of the party seeking to modify an order of support to show by competent evidence that a change of circumstances justifies a modification." *Id.* at 388.

*Busse,* 921 A.2d at 1255.[7]

Husband relies on the *Schenk* case, contending that because the *Schenk* court held that the trial court's conclusion that the wife was not entitled to APL for the period in which she lived with her boyfriend was not an abuse of discretion, we should like-

---

7. One of Husband's claims is that Wife did not prove a need for APL. However, he overlooks the fact that he filed for a modification of the agreed upon APL order that had been in effect since April of 2005. Pursuant to

*Busse,* it appears that not Wife but Husband had the burden to show a change in circumstances so that the APL payment could be modified.

wise hold that Wife was not entitled to APL beyond the two years recommended by the master. However, the *Schenk* decision concluded that since the wife, whose living expenses were provided entirely by her boyfriend, failed to testify or submit evidence as to need, the trial court did not abuse its discretion by denying APL.

The situation here is not the same as that in *Schenk*. The master recommended the termination of APL because the marriage was rather short and Wife was living with Mr. Kerr on a part time basis. The trial court disagreed, and relying on *Haentjens* and *Schenk*, it indicated that APL usually ends when the divorce decree is issued and equitable distribution has been determined. Trial Court Support Order, 11/20/09, n. 1. The court further stated that APL aids the dependent spouse to maintain the standard of living enjoyed during the marriage, so that both parties have equal financial resources to pursue the divorce even though one party has the major assets. Also, the court noted that "APL may not be denied on the basis that a spouse is cohabiting with another." *Id.* The court further explained that the length of the APL payments in this case will not extend beyond the six-year period that the parties lived together in light of the concurrent divorce decree which embodied the equitable distribution of the marital estate. *Id.* The court additionally noted that although early termination of APL could not be predicated on Wife's cohabitation, that fact was a proper basis upon which to impose the 20% downward deviation since Mr. Kerr was living with Wife part time but was not contributing to the living expenses. *Id.* Also, in its order issued in response to Wife's exception to the master's Support Report, the court recognized Wife's need for APL, noting that although Wife will receive substantial assets following equitable distribution, she did not have access to those funds during the litigation. The court further explained:

> In addition, Husband directly impaired Wife's financial situation by his willful and repeated failures to pay any amount of APL, over substantial periods of time ... in defiance of express agreements and outstanding court orders to do so, together with his failure to produce documents and evidence in response both to discovery requests and to direct court orders to do so.... Notwithstanding Wife's continuance requests in 2007, which Husband did not oppose, ... Husband unreasonably delayed proceedings, which his use of four (4) different attorneys only exacerbated. Husband's contumacious behavior repeatedly increased the costs and fees incurred by Wife. Without question, Wife's ability to defend herself has not been commensurate with that of Husband. *Schenk*, 880 A.2d [at] 644-5, *citing Haentjens*, at 1062. Consequently, the record supports termination of Wife's APL upon the conclusion of litigation and not sooner.

Trial Court Support Order, 11/20/09, at n. 1 (citations to the record omitted). Again, having reviewed the record, we conclude that the trial court's findings are supported by evidence contained therein and the conclusion it reached that APL should be paid until the end of the divorce proceedings is not an abuse of discretion. Thus, Husband's sixth and seventh issues are without merit.

With regard to Husband's last issue, he contends that Wife did not carry her burden of proving that his behavior was willful, that he possessed wrongful intent, and that he had the present ability to comply with the APL order. Husband complains that he could not afford to pay the amount he had agreed to due to Wife's actions in that the system Wife set up to enhance his piano tuning business was taken by her

and not returned. Husband also refers to Wife's affair with Mr. Kerr and his allegation that Wife duped him into giving up their business as contributing to his decline in income.

 In *Hyle v. Hyle*, 868 A.2d 601 (Pa.Super.2005), this Court set forth the applicable law that applies to contempt proceedings:

> Our scope of review when considering an appeal from an order holding a party in contempt of court is narrow: We will reverse only upon a showing of an abuse of discretion. *See Diamond v. Diamond*, 792 A.2d 597, 600 (Pa.Super.2002). The court abuses its discretion if it misapplies the law or exercises its discretion in a manner lacking reason. *See Lachat v. Hinchliffe*, 769 A.2d 481, 487 (Pa.Super.2001).
>
> The purpose of a civil contempt order is to coerce the contemnor to comply with a court order. *See Gunther v. Bolus*, 853 A.2d 1014, 1016 (Pa.Super.2004), *appeal denied*, 578 Pa. 709, 853 A.2d 362 (2004). Punishment for contempt in support actions is governed by 23 Pa. C.S. § 4345. Section 4345 provides that
>
> **(a) General rule.**—A person who willfully fails to comply with any order under this chapter, except an order subject to section 4344 (relating to contempt for failure of obligor to appear), may, as prescribed by general rule, be adjudged in contempt. Contempt shall be punishable by any one or more of the following:
>
>> (1) Imprisonment for a period not to exceed six months.
>>
>> (2) A fine not to exceed $1,000.
>>
>> (3) Probation for a period not to exceed one year.
>
> **(b) Condition for release.**—An order committing a defendant to jail under this section shall specify the condition the

fulfillment of which will result in the release of the obligor.

23 Pa.C.S. § 4345.

> To be found in civil contempt, a party must have violated a court order. *See Garr v. Peters*, 773 A.2d 183, 189 (Pa.Super.2001). Accordingly, the complaining party must show, by a preponderance of the evidence, that a party violated a court order. *See Sinaiko v. Sinaiko*, 445 Pa.Super. 56, 664 A.2d 1005, 1009 (1995). The alleged contemnor may then present evidence that he has the present inability to comply and make up the arrears. *See Barrett v. Barrett*, 470 Pa. 253, 264, 368 A.2d 616, 621 (1977); *see also, Sinaiko*, 664 A.2d at 1009. When the alleged contemnor presents evidence that he is presently unable to comply
>
>> the court, in imposing coercive imprisonment for civil contempt, should set conditions for purging the contempt and effecting release from imprisonment with which it is convinced beyond a reasonable doubt, from the totality of the evidence before it, the contemnor has the present ability to comply.

*Hyle*, 868 A.2d at 604–05 (quoting *Barrett*, 470 Pa. at 264, 368 A.2d at 621).

The trial court's support order issued on November 20, 2009, granted Wife's contempt petition, finding Husband in contempt of the June 23, 2005 support order, which incidentally was the APL order agreed to by the parties. Pursuant to the November 20, 2009 order, Husband was

> placed on probation for a period of six (6) months from the date of this order conditioned upon his compliance with all of the below listed requirements.

In order to purge himself of his civil contempt, Husband shall:

1. Fully and timely comply with each and every duty and obligation set forth in this order.

2. Within thirty (30) days of the date of this order, pay a $1,000.00 fine to Wife, pursuant to 23 Pa.C.S. § 4345(a)(2), due to Husband's contemptuous behavior. Husband shall deliver this amount to Wife's attorney, Sheryl R. Rentz, Esquire.

Trial Court Support Order, 11/20/09.

In its opinion issued pursuant to Pa. R.A.P. 1925(a), the trial court explained the basis for it decision to hold Husband in contempt, stating:

> [T]he court was aware at the time of its decision that the party alleging contempt has the burden to prove that the alleged contemnor acted willfully with wrongful intent. *In re Contempt of Cullen*, 849 A.2d 1207, 1210–1211 (Pa.Super.2004), *appeal denied*, [582 Pa. 676] 868 A.2d 1201 ( [Pa.] 2004 [2005] ). All of the factual references in footnote 1 of the [November 11, 2009 Support Order] are factual findings of the court which support the determination that Husband willfully acted with wrongful intent. Furthermore, the court herein reaffirms and finds that Wife did meet her burden to prove that Husband acted willfully with wrongful intent, that Husband in fact willfully acted with wrongful intent and that the record is replete with credible evidence of that contempt. Where Husband's and Wife's evidence may have conflicted on the issue of contempt, the court also reaffirms and finds that Wife's testimony and evidence was credible, and Husband's testimony and evidence was not credible, on this issue.

Trial Court Rule 1925(a) Opinion, 2/5/10, at 6 n. 1.[8]

 It is evident that the trial court did not believe Husband's assertions, in particular, that he was unable to pay any amount of the APL. The court identifies the evidence it believed and upon which it based its conclusions. Evidence exists in the record to support the court's determination that Husband had the ability to pay, albeit lesser amounts for each ensuing year, and that he acted willfully and with wrongful intent. We therefore conclude that the trial court did not abuse its discretion in regard to its decision to hold Husband in contempt. Thus, Husband's last issue is without merit.

Divorce Decree entered November 20, 2009 is affirmed. Support Order entered November 20, 2009 is affirmed.

---

**8.** The pertinent part of the November 20, 2009 Support Order, discussing Husband's failures to timely pay the APL and his other actions impacting the timeliness of the proceedings, is reproduced above in connection with our discussion of the APL issues. *See* Trial Court Support Order, 11/20/09, at n.1.